IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

OLIVIA BUCKNER BAILEY          *
On Her Own Behalf and on Behalf
of all Other Consumers Similarly*
Situated
                               *

          Plaintiff
                               *

          vs.                      CIVIL ACTION NO. MJG-13-1243
                               *
ATLANTIC AUTOMOTIVE CORP.,
et al.                         *

          Defendants          *

*     *     *     *     *     *     *     *     *

MEMORANDUM AND ORDER RE: MOTION TO DISMISS

The Court has before it Defendants' Motion to Dismiss

Second Amended Complaint [Document 21] and the materials

submitted relating thereto.  The Court has held a hearing and

has had the benefit of the arguments of counsel.


I.    BACKGROUND[1]

In 2009, Plaintiff Olivia Buckner Bailey ("Plaintiff" or

"Bailey") purchased a used vehicle ("the Vehicle") from Heritage

Chevrolet-Buick, Inc. ("Heritage") that was not identified as

having been a prior short-term rental.  Subsequent to her

purchase, Bailey discovered that the vehicle had in fact

formerly been used commercially as a short-term rental.

---

[1]    The "facts" herein are as alleged by Plaintiff and are not
necessarily agreed upon by Defendants.

Bailey has filed the instant class action complaint[2] against

Heritage, its 100% owner Atlantic Automotive Corporation

("Atlantic"), and some twenty[3] other wholly owned subsidiaries of

Atlantic ("the Other Dealer Defendants")[4] that sell used cars in

the course of their business.

Bailey asserts that Heritage and the Other Dealer

Defendants have engaged in a concerted and fraudulent scheme to

sell prior short-term rental vehicles to consumers without

disclosing that fact. Bailey seeks to proceed on behalf of a

class consisting of persons who purchased former short-term

---

[2]    On February 1, 2013, Bailey commenced the instant action on
behalf of herself and other similarly situated consumers in the
Circuit Court for Baltimore County, Maryland. On April 26,
2013, the Defendants timely removed the action to this Court.
[3]    The parties sometimes refer to a different number of
subsidiaries. In any event, there are well over a dozen, and
the precise number is immaterial.
[4]    Heritage Imports, Inc. t/a Heritage Subaru, Heritage
Volkswagen; Heritage of Owings Mills II, Inc. t/a Heritage
Chrysler Dodge Jeep Ram Owings Mills; I. Heritage, Inc. t/a
Heritage Mazda; Heritage of Towson, Inc. t/a Heritage Honda;
Heritage of Towson II, Inc. t/a Heritage Hyundai Towson;
Heritage of Towson III, Inc. t/a Heritage Mazda Towson; Heritage
of Owings Mills, Inc. t/a Heritage Fiat; Griffith Auto Group,
Inc. t/a Heritage Chrysler Dodge Jeep Ram Parkville; Griffith
Auto Group, Inc. t/a Heritage Volkswagen Parkville; Heritage of
Belair, Inc. t/a Heritage Mazda of Bel Air; Heritage of Bel Air,
Inc. Heritage Automall of Bel Air; Herb Gordon Auto Group, Inc.
t/a Herb Gordon Subaru; Herb Gordon Auto Group, Inc. t/a Herb
Gordon Volvo; Tischer Autopark, Inc. t/a Porsche of Silver
Spring; Tischer Autopark, Inc. t/a Audi of Silver Spring;
Tischer Autopark, Inc. t/a BMW of Silver Spring; Herb Gordon
Auto Group, Inc. t/a Mercedes-Benz of Silver Spring; Herb Gordon
Auto Group, Inc. t/a Herb Gordon Nissan; Heritage of
Westminster, Inc. t/a Heritage Honda of Westminster; and
Annapolis Motors, LLC t/a Mercedes-Benz of Annapolis and Smart
Center of Annapolis.

rentals from Heritage and the Other Dealer Defendants without

receiving disclosure or identification of that information in

violation of Maryland law.

The Second Amended Complaint ("SAC") presents claims in ten

Counts:

| | |
|---|---|
| Count One | Implied Warranty of Merchantability, |
| Count Two | Magnuson-Moss Warranty Act, |
| Count Three | Maryland Consumer Protection Act, |
| Count Four | Deceit by Non-Disclosure or Concealment, |
| Count Five | Unjust Enrichment, |
| Count Six | Negligent Misrepresentation, |
| Count Seven | Breach of Contract, |
| Count Eight | Racketeer Influenced and Corrupt Organizations Act ("RICO") – 18 U.S.C. § 1962(a), |
| Count Nine | RICO – 18 U.S.C. § 1962(c), and |
| Count Ten | RICO – 18 U.S.C. § 1962(d). |

By the instant motion:

- The Other Dealer Defendants seek dismissal of all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(1)[5] for lack of standing, and

- Heritage and Atlantic seek dismissal of the claims asserted against them in Counts One, Two Three, Eight, Nine, and Ten pursuant to Rule 12(b)(6).

---

[5] All "Rule" references herein are to the Federal Rules of Civil Procedure.

II.  <u>STANDING TO SUE THE OTHER DEALER DEFENDANTS</u>

In June, 2009, Bailey purchased the Vehicle from Heritage in a transaction in which Heritage violated Maryland law by failing to disclose properly the Vehicle's pertinent history. Bailey had no relevant contact or communication with any of the Other Dealer Defendants.  The Other Dealer Defendants contend that Bailey lacks standing to sue them on any of the claims made in the SAC.

The Defendants assert that Bailey lacks standing under Article III of the Federal Constitution to pursue the claims against the Other Dealer Defendants because she had no direct commercial dealings with those defendants pertinent to this action and because there is no cognizable claim of conspiracy capable of salvaging her lack of standing.

A.  <u>Nature of the Motion</u>

A motion to dismiss for lack of constitutional or prudential standing is generally treated as a motion under Rule 12(b)(1) because, absent a Plaintiff with standing, a court lacks subject matter jurisdiction over a claimant's case.  <u>See</u> <u>McInnes v. Lord Balt. Emp. Ret. Income Account Plan</u>, 823 F. Supp. 2d 360, 362 (D. Md.  2011); <u>cf.</u> <u>Pitt Cnty. v. Hotels.com,</u> <u>L.P.</u>, 553 F.3d 308, 312 (4th Cir. 2009) ("Our determination that the County has standing to bring this action countermands the

district court's dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1).").

While a 12(b)(1) motion permits the district court to consider evidence outside the pleadings without converting the motion to dismiss into one for summary judgment,[6] the parties in the instant case have not requested consideration of such evidence.  See Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999).  As a result, when considering a motion to dismiss under Rule 12(b)(1) and "a defendant has not provided evidence to dispute the veracity of the jurisdictional allegations in the complaint, the court accepts facts alleged in the complaint as true just as it would under Rule 12(b)(6)." Nat'l Alliance for Accessibility, Inc. v. Big Lots Stores, Inc., No. 1:11-CV-941, 2012 WL 1440226, at *3 (M.D.N.C. Apr. 26, 2012).

Plaintiff bears the ultimate burden "clearly to allege facts demonstrating that [s]he is a proper party to invoke judicial resolution of the dispute." Warth v. Seldin, 422 U.S. 490, 518 (1975).


B.    Legal Principles

"In every federal case, the party bringing the suit must establish [Article III] standing to prosecute the action.  'In

---

[6]    Rule 12(b)(1) also permits the district court to resolve ultimately any factual disputes related to subject-matter jurisdiction.

essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004) (quoting Warth, 422 U.S. at 498). To meet the standing requirement, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751 (1984). That is, "'the party invoking federal court jurisdiction must show that (1) it has suffered an injury in fact, (2) the injury is fairly traceable to the defendants' actions, and (3) it is likely, and not merely speculative, that the injury will be redressed by a favorable decision.'" Pitt Cnty., 553 F.3d at 312 (citation omitted). These elements are the constitutional components of standing. See Allen, 468 U.S. at 751.

With respect to injury in fact, the plaintiff must demonstrate the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citations omitted). "[T]he injury must affect the plaintiff in a personal and individual way." Id. at 560 n.1. In line with this requirement, third party standing is generally forbidden because "a litigant must assert his or her own legal rights and interests, and cannot

rest a claim to relief on the legal rights or interests of third

parties." Powers v. Ohio, 499 U.S. 400, 410 (1991). The

general prohibition against third party standing is one of the

prudential components of standing, which are not

constitutionally required, but are "matters of judicial self-

governance." See Elk Grove, 542 U.S. at 12.

These constitutional and prudential standing requirements

and the principles applicable thereto are pertinent in the

context of a putative class action. As the United States

Supreme Court has noted:

> "That a suit may be a class action . . .
> adds nothing to the question of standing,
> for even named plaintiffs who represent a
> class 'must allege and show that they
> personally have been injured, not that
> injury has been suffered by other,
> unidentified members of the class to which
> they belong and which they purport to
> represent.'"

Lewis v. Casey, 518 U.S. 343, 357 (1996) (alteration in

original) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S.

26, 40 n. 20 (1976)). The United States Court of Appeals for

the Fourth Circuit has echoed this outlook, stating that in the

class action context, it "is essential that named class

representatives demonstrate standing through a 'requisite case

or controversy between themselves personally and'" each

defendant. Cent. Wesleyan Coll. v. W.R. Grace & Co., 6 F.3d

177, 188 (4th Cir. 1993) (quoting Blum v. Yaretsky, 457 U.S.

991, 1001 n. 13 (1982)); see also Lieberson v. Johnson & Johnson Consumer Co., Inc., 865 F. Supp. 2d 529, 537 (D.N.J. 2011) (holding that the plaintiff lacked standing to pursue putative class action claims of consumer fraud against a baby bath product manufacturer as to any products the named plaintiff did not allege she used or purchased).

When a named plaintiff in a putative class action seeks to pursue claims against defendants with whom the named plaintiff did not have direct dealings, significant questions arise as to whether the plaintiff can establish an injury in fact with respect to those defendants.  In such a situation, a plaintiff may be able to satisfy the injury aspect of standing through sufficient allegations of conspiracy.  For instance, the Fourth Circuit has recognized that "allegations of conspiracy among parties with whom a plaintiff did not directly deal may confer standing upon the plaintiff to sue the non[-]dealing parties." Cent. Wesleyan Coll., 6 F.3d at 188 (citing Brown v. Cameron-Brown Co., 652 F.2d 375, 378 (4th Cir. 1981)).  However, a plaintiff's reliance on allegations of conspiracy "'may make it substantially more difficult'" to satisfy the "case or controversy" requirement of Article III,[7] given the indirectness of the injury.  See id. (quoting Warth, 422 U.S. at 505).

_____

[7]     The "case or controversy" requirement of Article III reads:

C. <u>Conspiracy Contention</u>

Bailey contends that the Other Dealer Defendants are liable as co-conspirators with Heritage and Atlantic because the relevant actions of Heritage were in furtherance of a conspiracy to sell former short-term rental vehicles to consumers without disclosing the vehicles' history.

A civil conspiracy is "'a combination of two or more persons by and agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff.'" <u>Hoffman v. Stamper</u>, 385 Md. 1, 24, 867 A.2d 276, 290, (2005) (citation omitted); <u>see</u> <u>also</u> <u>Beck v. Prupis</u>, 529 U.S. 494,

---

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; – . . . – to Controversies to which the United States shall be a Party; – to Controversies between two or more States; – between a State and Citizens of another State; – between Citizens of different States . . . .

U.S. Const. art. III, § 2, cl. 1. The Supreme Court has stated that "[b]y cases and controversies are intended the claims of litigants brought before the courts for determination by such regular proceedings as are established by law or custom for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs." <u>Muskrat v. United States</u>, 219 U.S. 346, 357 (1911).

500-04 (2000) (discussing a civil cause of action for conspiracy in the context of a RICO claim).

The SAC includes allegations that present a plausible claim that Heritage, the Other Dealer Defendants, and Atlantic acted in concert pursuant to an agreement to accomplish an unlawful purpose of selling prior rental cars without disclosing that information to customers, one of whom was Bailey, who sustained damage as a result.

Accordingly, Bailey would have a valid claim against the Other Dealer Defendants if it were not for the fact that Heritage and each of the Other Dealer Defendants was a 100%-owned subsidiary of Atlantic. This fact, however, renders pertinent the intracorporate conspiracy doctrine recognized by the Supreme Court in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), and its progeny. This doctrine will, absent a pertinent exception, require dismissal of Bailey's conspiracy claims against the Other Dealer Defendants. Cf. AGV Sports Grp., Inc. v. Protus IP Solutions, Inc., No. RDB 08-3388, 2009 WL 1921152, at *4-5 (D. Md. July 1, 2009) (concluding that the plaintiff failed to make a prima facie showing of personal jurisdiction based on a conspiracy theory on the grounds that the defendants were legally incapable of conspiring with each other under the intracorporate conspiracy doctrine).

1.  The Copperweld Decision

In Copperweld Corp. v. Independence Tube Corp., the Supreme
Court affirmed the validity of the intracorporate conspiracy
doctrine[8] in antitrust cases, holding that a corporation is
legally incapable of conspiring with its wholly owned
subsidiary, or its agents, officers, or employees, because such
a claim is tantamount to a conspiracy made up of a single actor
or of the actions of a single actor.[9]  467 U.S. 752, 766-67, 776-
77 (1984).  The Court explained that "[a] parent and its wholly
owned subsidiary have a complete unity of interest[, and t]heir
objectives are common [because] the subsidiary acts for the
benefit of the parent."  Id. at 771.  Thus, "the coordinated
activity of a parent and its wholly owned subsidiary must be
viewed as that of a single enterprise."  Id.  Courts have
applied the intracorporate conspiracy doctrine to a variety of
civil conspiracy claims, including common law and RICO
conspiracy claims.  See, e.g., Lewin v. Cooke, 28 F. App'x 186,

---

[8]     The "intracorporate conspiracy doctrine" is also referred
to as the "intracorporate immunity doctrine."  See Nilavar v.
Mercy Health Sys. W. Ohio, 142 F. Supp. 2d 859, 888 (S.D. Ohio
2000) (acknowledging doctrine referred to by both names).
[9]     Courts had applied the intracorporate conspiracy doctrine
prior to the Supreme Court's decision in Copperweld.  See, e.g.,
Greenville Publ'g Co. v. Daily Reflector, Inc., 496 F.2d 391,
399 (4th Cir. 1974) ("The district court held that a corporation
cannot be guilty of conspiring with its officers or agents
. . . .  We agree with the general rule . . . .").

195 (4th Cir. 2002) (state law conspiracy claim); <u>Walters v.</u>
<u>McMahen</u>, 795 F. Supp. 2d 350, 351, 358-59 (D. Md. 2011) (RICO
conspiracy claim), <u>aff'd</u>, 684 F.3d 435 (4th Cir. 2012); <u>see also</u>
<u>Locus v. Fayetteville State Univ.</u>, 870 F.2d 655, at *1-2 (4th
Cir. 1989) (acknowledging application of the doctrine in the
civil rights context).  The doctrine has also been extended to
preclude, as a matter of law, claims of conspiracies among
sister corporations wholly owned by the same parent.  <u>See, e.g.</u>,
<u>Advanced Health Care Servs., Inc. v. Radford Cmty. Hosp.</u>, 910
F.2d 139, 145-47 (4th Cir. 1990) (examining an antitrust case).

> 2.   <u>The Independent Personal Stake Exception</u>
>> a.   <u>Legal Principles</u>

The Fourth Circuit has recognized "one narrow exception to
the intracorporate immunity doctrine — the independent personal
stake exception."  <u>Am. Chiropractic Ass'n v. Trigon Healthcare,</u>
<u>Inc.</u>, 367 F.3d 212, 224 (4th Cir. 2004).  In an antitrust case
in which a corporate defendant was alleged to have conspired
with the president of the company, the Fourth Circuit
acknowledged that while generally "a corporation cannot be
guilty of conspiring with its officers or agents, . . . an
exception may be justified when the officer has an independent
personal stake in achieving the corporation's illegal
objective."  <u>Greenville Publ'g Co. v. Daily Reflector, Inc.</u>, 496

F.2d 391, 399 (4th Cir. 1974). Stated differently, the exception is applied "only where a co-conspirator possesses a personal stake independent of his relationship to the corporation." ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 179 (4th Cir. 2002) (citing Oksanen v. Page Mem'l Hosp., 945 F.2d 696, 705 (4th Cir. 1991)). The independent personal stake exception is rooted in the notion "that there can be no unity of purpose between a corporation and its agents if the agents have a personal stake independent of the interests of the corporation." Baylor v. Comprehensive Pain Mgmt. Ctrs., Inc., No. 7:09cv00472, 2011 WL 1327396, at *13 (W.D. Va. Apr. 6, 2011); see also ShoreGood Water Co., Inc. v. U.S. Bottling Co., No. RDB 08-2470, 2009 WL 2461689, at *7 (D. Md. Aug. 10, 2009) ("In order for this exception to apply, there must be a showing that the interests of the company and the conspirators are clearly distinct.").

The Fourth Circuit has considered there to be a personal stake of a corporate agent adequate to overcome the intracorporate conspiracy doctrine in only limited circumstances. For instance, the Fourth Circuit views the exception as covering situations in which the corporate agent personally stands to benefit financially from the conspiracy based upon the agent's economic interest in an entity separate from the principal corporation. See Greenville Publ'g Co., 496

13

F.2d at 399-400. Additionally, the exception "plainly applies" when corporate agents conspire with each other to send the corporation into bankruptcy by siphoning money out of the corporation because in such an situation, the conspirator corporate agents "personally profited at [the corporation's] expense" as a result of the scheme. ePlus Tech., 313 F.3d at 179-80; see also In re Rood, 482 B.R. 132, 144 (D. Md. 2012) (applying the independent personal stake exception when a corporate agent used corporate entities as "corporate shells to facilitate his illegal activities" by taking corporate monies for his own personal purposes), aff'd sub nom. S. Mgmt. Corp. Ret. Trust v. Rood, 12-2359, 532 F. App'x 370 (4th Cir. 2013) and aff'd sub nom. S. Mgmt. Corp. Ret. Trust v. Jewell, No. 12-2319, 533 F. App'x 228 (4th Cir. 2013). However, where a corporate agent's participation in the conspiracy merely yields higher compensation to the employee or officer from the corporation, courts have generally considered the interests of the company and the employee/officer conspirator to be aligned. See, e.g., United States v. Gwinn, No. 5:06-CV-00267, 2008 WL 867927, at *25-26 (S.D. W. Va. Mar. 31, 2008).

<u>Alleged Personal Stake of Heritage,</u>
            <u>Atlantic, and the Other Dealer Defendants</u>

Bailey contends that she has alleged sufficiently the

exception to the intracorporate conspiracy doctrine because the

named corporate Defendants had an independent "personal

financial stake in the above-referenced conspiracy and

[associated] to illegally increase the individual profits and

personal gain of each Dealer Defendant [and Heritage] and its

employees."  SAC ¶ 56.  According to Bailey:

> [P]ayments by [Plaintiff] and [the putative]
> Class members to one Defendant actually
> resulted in separate monetary benefits to
> each of the individual Defendants resulting
> from their conspiracy and association as
> MileOne Automotive.  The Defendants and/or
> their owners and employees had an individual
> profit motive in selling prior-rental
> vehicles without disclosing such prior use
> to consumers.

<u>Id.</u> ¶ 165.  Thus, Plaintiff takes the position that because each

Defendant corporation stood to profit individually from the

scheme – as separate entities – each Defendant had a personal

stake in the conspiracy wholly independent from its relationship

with Atlantic.  The Defendants assert that the exception is

inapplicable and/or is contrary to Bailey's claim that Heritage

and the Other Dealer Defendants acted at the direction of

Atlantic.

The independent personal stake exception is invoked and

evaluated predominately in the context of an alleged conspiracy

between a corporation and its officers, directors, and/or employees or among agents of the same principal corporation. Cf. Gwinn, 2008 WL 867927, at *25. In the typical situation, a court can logically compare the individual conspirators' interests in the conspiracy with those of the principal corporation to determine whether the individual conspirators have personal economic interests in achieving the object of the conspiracy outside of, or contrary to, their roles as agents of the corporation.

However, when the conspirators are a parent and its wholly owned subsidiaries, questions arise as to the applicability of the independent personal stake exception. For example, it is not clear whether wholly owned subsidiaries are legally capable of having economic interests or a stake in the conspiracy independent of and/or separate from the interest of their parent.

Plaintiff has pointed to no judicial decision addressing the independent personal stake exception in the instant circumstance.[10] While this Court has not located any pertinent

_____

[10]    At the hearing, Plaintiff cited to two cases in support of her position that a parent and a wholly owned subsidiary can have distinct financial interests for purposes of the independent personal stake doctrine. The Court finds these cases unpersuasive because a parent and a wholly owned subsidiary were not truly at issue in the cases cited by Plaintiff. See Painter's Mill Grille, LLC v. Brown, 716 F.3d 342, 345, 3852-53 (4th Cir. 2013) (addressing the exception as

judicial analysis on the discrete parent/wholly owned subsidiary issue, a few courts have evaluated the independent personal stake exception in the context of a conspiracy among only principal and agent entities ("all-entity conspiracy"). In Ashco International Inc. v. Westmore Shopping Center Associates, 42 Va. Cir. 427 (Va. Cir. Ct. June 19, 1997), the Circuit Court of Virginia for Fairfax County dismissed a claim that a shopping center company conspired with its agent, an architectural company, to cause the general contractor plaintiff to breach the plaintiff's contract with the shopping center company for construction of an addition to the shopping center. Id. at *1, 6-7. The plaintiff claimed that the architectural company for the addition job conspired with the shopping center company "to appropriate to their benefit labor and material of [plaintiff and] to create grounds to breach the contract." Id. at *6. The court concluded that the principal entity and the agent entity could not conspire together, reasoning "that the independent stake exception d[id] not save Plaintiff's claim" because

---

to an alleged conspiracy between a parent corporation, a subsidiary, and three individual employees of both entities and affirming dismissal of the conspiracy claim on grounds that the employees had no independent stake in the conspiracy); Mitchell Tracey v. First Am. Title Ins. Co., 935 F. Supp. 2d 826, 842-46 (D. Md. 2013) (evaluating an alleged conspiracy between a corporate defendant and non-party title agents who were permitted to work with different insurance companies and determining that "[t]he intracorporate conspiracy doctrine does not preclude relief.").

"[a]ssuming that the . . . exception applies . . . to intra-
agency conspiracies,[] the facts alleged d[id] not support the
inference that [the agent company] gained any direct personal
benefit from the alleged conspiracy." Id. at *7.

Additionally, the Eleventh Circuit in St. Joseph's
Hospital, Inc. v. Hospital Corp. of Am., 795 F.2d 948 (11th Cir.
1986), assessed an antitrust conspiracy claim among an
independent hospital ("the independent hospital"), a hospital
corporation ("the corporation"),[11] and the corporation's wholly
owned subsidiary that managed the hospital ("the management
company"). Id. at 949-51, 955-56. In St. Joseph's Hospital, a
plaintiff hospital alleged that the conspirators engaged in a
scheme to stifle competition by preventing the plaintiff from
obtaining state certification to establish a cardiac surgery
program at its hospital. Id. at 949-53. On appeal from a Rule
12(b)(6) dismissal, the Eleventh Circuit discussed the lower
court's use of a "stacking approach" and agreed that, based on
the allegations in plaintiff's complaint, the defendants were a
single entity for purposes of the conspiracy claim. Id. at 955-
56. That is, the lower court determined that (1) the
corporation and management company were a single entity based on
the total ownership relationship, (2) the management company was

---

[11]    A hospital corporation is a corporation that operates
hospitals, some of which it owns and some of which it does not.

in an employment relationship with the independent hospital, and thus (3) they were all a single group generally incapable of conspiring with each other.  See id. at 956.

The plaintiff in St. Joseph's Hospital invoked the independent personal stake exception, arguing that the corporation/hospital management company and the independent hospital "were separate [independent] entities[12] with separate economic interests."  Id.  The Eleventh Circuit did not reject this theory, but instead found that plaintiff had "failed to support the allegations with sufficient facts to show that anyone other than [the hospital] had an 'independent personal stake' in the outcome of the conspiracy."  Id.  Hence, there is judicial recognition that the independent stake exception may allow for a conspiracy between two independent entities in a principal-agent relationship to the same extent as which the exception applies to the relationship between a corporation and its individual officers or agents.[13]

However, an all-entity conspiracy made-up of a parent corporation and its wholly owned subsidiaries is a horse of a different color due to the innate economic unity of such

---

[12]    In St. Joseph's Hospital, the corporation/hospital management company had no ownership interest in the independent hospital.
[13]    However, in the all-entity context, assessment of whether an entity agent has an independent personal stake may be more complicated than when the agent is an individual.

entities. As the Supreme Court explained in Copperweld, a parent corporation and its wholly owned subsidiary necessarily have aligned economic interests because the parent is the sole shareholder of the subsidiary. See Copperweld, 467 U.S. at 771-72. As a result, on the entity level, the economic prosperity of the subsidiary inures to the benefit of the parent as the sole owner.[14] See In re Teleglobe Commc'ns Corp., 493 F.3d 345, 367 (3d Cir. 2007) ("[P]arents and their wholly owned subsidiaries have the same interests because all of the duties owed to the subsidiaries flow back up to the parent[ and] the only interest of a wholly owned subsidiary is in serving its parent."). Yet, if sole-owner status categorically precluded availability of the independent personal stake exception, then the exception could never extend to an alleged conspiracy between a corporation and its sole individual shareholder, even if the sole shareholder stood to gain financially from the conspiracy as a result of his or her interest in another company, or if the sole shareholder was engaged in a scheme to loot his or her own corporation. Cf. ePlus Tech., 313 F.3d at 179; Greenville Publ'g, Co., 496 F.2d at 399-400. In any event, the Court need not decide whether the independent personal stake exception is inapplicable to a claim

---

[14] Of course, the relationship between a parent and its wholly owned subsidiary may be much more financially complicated than merely the direction of the subsidiaries' net profits to the parent.

20

of conspiracy between a parent entity and its wholly owned subsidiaries. Even assuming _arguendo_ that the exception is available to Plaintiff, the facts as alleged in the SAC are insufficient to sustain its invocation.

Here, Plaintiff alleges that the Other Dealer Defendants and Heritage have an independent personal stake, outside their relationship with Atlantic, in achieving the illegal objective of the non-disclosure conspiracy because each stood to profit individually from the scheme. As wholly owned subsidiaries of Atlantic, the fact that Heritage and the Other Dealer Defendants stood to profit from the scheme by selling a higher volume of former short-term rentals for above-market value is not a financial stake separate from, and independent of, their relationship with Atlantic. To the extent that Heritage and the Other Dealer Defendants increased their profits, so too did Atlantic as their sole owner. "Th[e] interpretation sought by plaintiffs would cause the 'exception' to swallow the general rule" because every conspiracy between a parent and its wholly owned subsidiary in which the subsidiary stood to profit from the conspiracy objective would – without anything more - bypass the intracorporate conspiracy doctrine. _See_ _Godfredson v. JBC Legal Grp., P.C._, 387 F. Supp. 2d 543, 550 (E.D.N.C. 2005) (holding that the independent personal stake exception was inapplicable to a claim that a law firm and its sole owner

21

conspired together where the plaintiff alleged that the owner had a personal stake in the conspiracy based on his financial interest in his own law firm); see also Patel v. Scotland Mem'l Hosp., 91 F.3d 132, at *3 (4th Cir. 1996) (explaining that the personal stake exception is limited "to include only instances where the individual conspiring has a personal financial interest in the conspiracy independent of the principal"); Douty v. Irwin Mortg. Corp., 70 F. Supp. 2d 626, 633 (E.D. Va. 1999) ("[T]he Fourth Circuit has signaled that the personal stake exception is a limited one.").

In sum, the SAC does not present a plausible claim that Heritage, the Other Dealer Defendants, and Atlantic were legally capable of conspiring with each other. Consequently, there is no viable conspiracy claim against the Other Dealer Defendants.[15]

D. Resolution

Plaintiff has not alleged a viable conspiracy claim against the Other Dealer Defendants. Without a cognizable conspiracy claim, Plaintiff provides no basis upon which she could have

---

[15] The SAC contains allegations that "[t]he Defendant and/or their owners and employees had an individual profit motive in selling prior-rental vehicles without disclosing such prior use to consumers." SAC ¶ 165. However, there are no claims asserted against any employees, and no employees are named as defendants in this action. Thus, the Court considers it immaterial that any of the Defendants' employees stood to profit individually as a result of the conspiracy.

standing to sue the Other Dealer Defendants with whom she had no direct commercial dealings.[16]

Accordingly, all claims against the Other Dealer Defendants in the Second Amended Complaint shall be dismissed.


III. <u>CLAIMS AGAINST HERITAGE AND ATLANTIC</u>

Bailey asserts claims against Heritage for its own actions and against its parent corporation Atlantic on a vicarious liability theory. These claims are based on:

- Implied Warranty of Merchantability – Counts One and Two

- Maryland Consumer Protection Act - Count Three

- Deceit, Unjust Enrichment, Negligent Misrepresentation, and Breach of Contract - Counts Four, Five, Six and Seven

- Racketeer Influenced and Corrupt Organizations Act ("RICO") - Counts Eight, Nine and Ten

By the instant motion, Heritage and Atlantic seek dismissal of Counts One, Two, Three, Eight, Nine, and Ten pursuant to Rule 12(b)(6).

---

[16]   Plaintiff has acknowledged that her standing to sue the Other Dealer Defendants is based solely on the conspiracy allegations. <u>See</u> [Document 24] at 9-10 ("This conspiracy among all of the MileOne Defendants, which resulted in injury to Ms. Bailey, gives her standing to sue each of them, as they all participated in the scheme which caused her damages.").

A.    12(b)(6) Dismissal Standard

A motion to dismiss filed pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint.  A complaint need only contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (citations omitted). When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and the complaint is viewed in the light most favorable to the plaintiff. However, conclusory statements or "a formulaic recitation of the elements of a cause of action will not [suffice]."  Id.  A complaint must allege sufficient facts "to cross 'the line between possibility and plausibility of entitlement to relief.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Twombly, 550 U.S. at 557).

Inquiry into whether a complaint states a plausible claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. (quoting Twombly, 550 U.S. at 557).  Thus, if "the well-pleaded facts [contained within a complaint] do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the

pleader is entitled to relief.'" Id. (quoting Ashcroft v.
Iqbal, 556 U.S. 662, 679 (2009) (alteration in original)).


B.    Merchantability Claims (Counts One and Two)

Plaintiff alleges that Heritage's failure to disclose the
prior short-term rental status of the Vehicle to her before
purchase constitutes a breach of the implied warranty of
merchantability protected by Maryland law under Md. Code Ann.,
Com. Law § 2-314 (2)(a) (Count One) and the implied warranty of
merchantability protected by the Magnuson-Moss Warranty Act,
15 U.S.C. §§ 2301-2312 (Count Two).  Actions for breach of the
implied warranty of merchantability as defined by the Magnuson-
Moss Warranty Act generally are governed by the application of
substantive state law.  See Doll v. Ford Motor Co., 814 F. Supp.
2d 526, 545 (D. Md. 2011).  Here, the parties agree that the
dismissal analysis of Plaintiff's state law implied warranty
claim is equally applicable to the federal law claim.

Plaintiff alleges that a vehicle sold without disclosure of
its prior short-term rental status is not merchantable because
such a vehicle would not "[p]ass without objection in the trade
under the contract description" within the meaning of § 2-
314(2)(a) of the Maryland Commercial Law Article.  That is,
Plaintiff claims that by leaving the disclosure box for former
rental status unchecked in the sales agreement, Heritage

"affirmatively and falsely represented that the [V]ehicle[] had not been used for short-term rentals" and thus that Heritage sold her what purported to be a former consumer vehicle.[17] SAC ¶ 130. According to the SAC, a vehicle described as a consumer vehicle, but that is in fact a prior short-term rental, would be objectionable in the trade because:

- "[There is a] perception that these vehicles are often driven hard by drivers who care little about them, may not have been well maintained or consistently maintained, and more often are involved in accidents than vehicles used for personal, family, and household purposes."

- "A vehicle's prior use for short-term rental is so significant both within the [retail] industry and to the public . . . ." and

- "[U]se for short-term rental depresses the market value of such vehicles."

See SAC ¶¶ 3, 122-125. The Defendants contend there is no plausible claim that the Vehicle was not merchantable because Plaintiff does not assert that the Vehicle suffered from any tangible physical defect as a result of its prior rental use.

---

[17] Plaintiff takes the position that Heritage's failure to disclose clearly and conspicuously the Vehicle's former short-term rental status in the sales agreement as required by Maryland law is tantamount to an affirmative representation that the Vehicle was a prior consumer vehicle. In their dismissal motion, the Defendants do not take issue with this characterization. For dismissal purposes, the Court will presume, without deciding, that the nondisclosure constituted an affirmative representation that the Vehicle was in fact used as a prior consumer vehicle.

Generally speaking, the implied warranty of merchantability concerns protecting buyers' expectations as to the condition and quality of goods sold by merchants.  See generally Robinson v. Am. Honda Motor Co., Inc., 551 F.3d 218, 225 (4th Cir. 2009) (discussing and applying Maryland law).  Under the Maryland Commercial Law Article, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  Md. Code Ann., Com. Law § 2-314(1).  Section 2-314(2) explains merchantability as follows:

> Goods to be merchantable must be at least such as
>
> (a)  Pass without objection in the trade under the contract description; and
>
> (b)  In the case of fungible goods, are of fair average quality within the description; and
>
> (c)  Are fit for the ordinary purposes for which such goods are used; and
>
> (d)  Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>
> (e)  Are adequately contained, packaged, and labeled as the agreement may require; and
>
> (f) Conform to the promises or affirmations of fact made on the container or label if any.

(emphasis added).

Section 2-314 of the Maryland Commercial Law Article, which adopts Section 2-314 of the Uniform Commercial Code, does not define "merchantability," but rather lists the aforesaid six independent minimum qualifications for a good to be considered of merchantable quality. See U.C.C. § 2-314 cmt. 6. The bulk of Maryland jurisprudence addresses the merchantability qualification that the good in issue be "fit for the ordinary purposes for which such goods are used" under § 2-314(2)(c). This comes as little surprise, given that the U.C.C. comments describe fitness for an ordinary purpose as "a fundamental concept" of the implied warranty of merchantability. U.C.C. § 2-314 cmt. 8. Maryland cases addressing the merchantability qualification of fitness for an ordinary purpose generally stem from a claim that a product has some tangible or physical "defect"[18] or other shortcoming that renders the product unfit for the ordinary purpose for which it is used; these cases often overlap with product liability claims. See, e.g., Crickenberger v. Hyundai Motor Am., 404 Md. 37, 57-59, 944 A.2d 1136, 1148-49

_____

[18]     Courts often employ the word "defect," which does not appear in § 2-314, in merchantability cases as a means to describe a discrete problem with a product that renders it unfit for its ordinary purpose, and thus, not merchantable. See Ford Motor Co. v. Gen. Acc. Ins. Co., 365 Md. 321, 326-27, 333-34, 779 A.2d 362, 365, 369 (2001) (holding, in a case in which the plaintiff alleged that a design defect in a truck rendered it unfit for its ordinary purpose under § 2-314(2)(c), that the plaintiff must prove "a specific product defect . . . to maintain a claim for breach of the implied warranty of merchantability").

(2008) (Murphy, J., concurring) ("[A] breach of implied warranty of merchantability action against a manufacturer is the functional equivalent of a strict liability action . . . ."); see also Simpson v. Standard Container Co., 72 Md. App. 199, 202, 207, 527 A.2d 1337, 1339, 1342 (1987) (dismissing a claim that a gasoline container designed without a childproof cap was not merchantable because "appellants failed to allege any facts that implied the can was not fit for its ordinary use, namely the storage of gasoline"). For instance, in the context of cars, "[t]he warranty of fitness for the ordinary purpose simply means that the automobile is fit for reasonably safe transportation when it is used in its normal manner." Mercedes-Benz of N. Am., Inc. v. Garten, 94 Md. App. 547, 562, 618 A.2d 233, 240 (1993) (citing Myers v. Montgomery Ward & Co., 253 Md. 282, 295-96, 252 A.2d 855, 863-64 (1969)); see also Carlson v. Gen. Motors Corp., 883 F.2d 287, 289, 297-98 (4th Cir. 1989) (holding that the district court properly dismissed a breach of implied warranty of merchantability claim that widespread problems with GM's diesel products had diminished the resale value of plaintiffs' cars on the grounds that "fit for the ordinary purposes" does not include claims of loss of resale value without any claim of defect).

While fitness for an ordinary purpose may be the most litigated of the minimum merchantability requirements set forth

in § 2-314(2), there exist five other independent and distinct criteria, and the failure of a qualifying good to meet any one those five requirements will result in non-merchantability.  See generally Garten, 94 Md. App. at 561-63, 618 A.2d at 240 (analyzing § 2-314(2)(c) and (a) separately and concluding that there was no evidence the car would be objectionable in the trade under the contract description as a result of a delayed shifting device on the grounds that all of the prior models had the same device and the car at issue was accepted by another dealer as a trade-in).  For instance, § 2-314(2)(a), at issue in the instant case, incorporates trade quality standards and assesses whether a certain good, when compared to other goods of the same contract description, would pass without objection in the pertinent trade.  See Robinson, 551 F.3d at 225 (dismissing plaintiff's claim that Michelin "run-flat" tires were not merchantable because their shorter tread life would prevent them from passing without objection in the trade on the grounds that plaintiff was comparing the Michelin tires to standard passenger tires and not to other run-flat tires).

The Maryland appellate courts have not yet addressed directly whether a vehicle can be considered non-merchantable under § 2-314(2) in the absence of a claim that the car suffers from some tangible defect (i.e., a design or manufacturing defect) or has some concrete physical problem that renders it of

a lesser quality than other cars of the same contract

description.[19] As a result, it is unclear whether Heritage's

failure to disclose an alleged undesirable fact about the

Vehicle's prior history can be considered objectionable in the

trade under the contract description within the meaning of § 2-

314(2)(a). At least one state court offers support for

Plaintiff's non-merchantability theory. In Terrell v. R & A

Manufacturing Partners, Ltd., 835 So. 2d 216 (Ala. Civ. App.

2002), the Court of Civil Appeals of Alabama concluded that

factual issues existed as to whether a trailer purchased by the

plaintiff would pass without objection in the trade and reversed

the lower court's grant of summary judgment to the defendant.

Id. at 228. In Terrell, the plaintiff submitted evidence that:

(1) the seller represented the trailer was a 2000 model, when in

fact it was a 1999 model; (2) the model year affected the resale

value; and (3) a purchaser would be unhappy with a 1999 model if

he or she had ordered a 2000 model. Id. at 222, 228. Based on

this evidence, the court "conclude[d] that whether the trailer

---

[19] Defendants rely upon Jones v. Koons Auto., Inc., 752 F.
Supp. 2d 670 (D. Md. 2010), to support their argument that the
implied warranty of merchantability does not remedy
misrepresentations and omissions as to the rental history of a
used vehicle. See [Document 21-1] at 14-15. While the Jones
case is factually on point and certainly persuasive, it does not
appear that the court in Jones was presented with the discrete
argument being made here by Plaintiff. Consequently, the Court
does not consider Jones fatal to Plaintiff's merchantability
claim in this case.

would pass without objection in the trade, and thus whether the implied warranty of merchantability was breached, remains a question for a fact-finder to determine." Id. at 228.

The Court doubts – in the absence of Maryland precedent supporting Bailey's position – that there would be a valid claim based upon a violation of an implied warranty of merchantability. Were Counts One and Two the only claims based upon the facts used for Bailey's merchantability contention, the Court likely would dismiss the claims therein. However, Bailey presents claims in Counts Four, Five, Six, and Seven that, in essence, rely upon the same factual allegations on which the merchantability contention is based. Therefore, the Court will not now dismiss Counts One and Two.


C.   Maryland Consumer Protection Act Claim (Count Three)

"[A] private party suing under the [MCPA] must establish 'actual injury or loss.'" Lloyd v. Gen. Motors Corp., 397 Md. 108, 143, 916 A.2d 257, 277 (2007). "[T]o articulate a cognizable injury under the [MCPA], the injury must be objectively identifiable . . . measured by the amount the consumer spent or lost as a result of his or her reliance on the seller's misrepresentation." Id. Because a person who files an MCPA complaint with the Attorney General, as opposed to filing a private suit, need not allege an actual injury occurred,

"[r]equiring actual injury in private suits strikes an important balance between two competing legislative objectives: preventing unfair or deceptive practices while precluding aggressive, 'self-constituted private attorneys general' from bringing suit 'over relatively minor statutory violations.'" Marchese v. JPMorgan Chase Bank, N.A., 917 F. Supp. 2d 452, 467-68, (D. Md. 2013) (quoting Citaramanis v. Hallowell, 328 Md. 142, 152, 613 A.2d 964, 968 (1992)).

The SAC includes factual allegations that Heritage purposefully concealed the prior short-term rental status of the Vehicle purchased by Plaintiff because such a status decreases a vehicle's market value and makes the car harder to sell, as well as allegations that Plaintiff paid more for the Vehicle than it was worth. See SAC ¶¶ 54, 63, 150. The SAC does not aver explicitly that Heritage priced the Vehicle it sold to Plaintiff as a consumer vehicle rather than as a former short-term rental, or that such pricing had the effect of increasing the Vehicle's sale price. However, when viewing the facts from the vantage point of Plaintiff and with all reasonable inferences drawn in her favor, there is support for such an inference. Cf. Tobey v. Jones, 706 F.3d 379, 383 (4th Cir. 2013) ("[W]e find the facts as alleged by [plaintiff] plausibly set forth a claim . . . . [T]he facts set forth are from the vantage point of [plaintiff], with all reasonable inferences drawn in his favor."). Plaintiff

has pleaded a plausible claim within the meaning of the MCPA
that she was overcharged for the Vehicle, and thus, suffered
actual injury or loss as a result of Heritage's
misrepresentation. The averments in the SAC are also adequate
to support a viable claim that Plaintiff suffered actual loss
because she purchased a vehicle that was represented to have
been formerly used as a consumer vehicle,[20] but that was in fact
a prior short-term rental, which depreciated the vehicle's
value.[21]

Defendants rely on Jones v. Koons Automotive, Inc., 752 F.
Supp. 2d 670 (D. Md. 2010), to support their position that the
Plaintiff has failed to plead actual injury or loss under the
MCPA. In Jones, the court dismissed the plaintiff's MCPA claim
based upon a failure to disclose the prior rental status of a
used car. See id. at 683-85. The Jones court stated:

---

[20]   As discussed supra, Plaintiff takes the position that the
failure to disclose clearly and conspicuously that the Vehicle
was a prior short-term rental is tantamount to an affirmative
representation that the car was previously a consumer vehicle.
[21]   In the Reply to the instant Motion, Defendants contend that
Plaintiff's injury claim is implausible because "the Kelley Blue
Book – a source widely used to determine the value of
automobiles - does not contain a separate value for used cars
that have previously served as short-term rentals." [Document
26] at 17. "A motion to dismiss under Rule 12(b)(6) tests the
sufficiency of a complaint; importantly, it does not resolve
contests surrounding the facts, the merits of a claim, or the
applicability of defenses." See Republican Party of N.C. v.
Martin, 980 F.2d 943, 952 (4th Cir. 1992). Thus, the Court will
not adjudicate whether, in fact, prior rental vehicles are
priced lower than consumer vehicles.

The complaint does not point to any "cost of remedy" or any other actual harm with respect to Koons' alleged concealment of the car's prior use as a rental car. Jones merely states that she would not have purchased the car or "would have demanded significant price concessions." (ECF No. 13-2, Am. Compl. ¶ 22). She does not allege that she incurred additional repair costs, for instance, because of the car's prior use. <u>Nor does she allege that the concealed fact caused any diminution in the value of the car.</u> See <u>Hallowell v. Citaramanis</u>, 88 Md. App. 160, 170, 594 A.2d 591 (1991) (determining whether actual injury was establishing by looking to whether purchaser suffered a diminution in the value of the purchased property because of seller's misrepresentations). A hypothetical price concession is simply not the type of tangible injury appropriately recognized in a private MCPA action, as virtually any misrepresentation could support such a claim of "injury." The MCPA claim based on the car's status as a rental car must be dismissed.

<u>Id</u>. at 684 (emphasis added).

In the instant case, Bailey does, as the plaintiff in <u>Jones</u> did not, allege that she was overcharged for the Vehicle and that the Vehicle is worth less as a result of its true status.

Accordingly, Count Three shall not be dismissed.

D.  RICO Claims (Counts Eight, Nine, and Ten)

Plaintiff alleges that the Defendants[22] "confederated together to form an 'association in fact' racketeering enterprise – the informal, non-incorporated MileOne Automotive group," and that through that enterprise the Defendants engaged in a pattern of racketeering activity, namely, employing a fraudulent scheme to sell prior short-term rental vehicles without disclosure of that fact to purchasers and using the U.S. mails and electronic or telephonic communications in execution of the scheme.  See [Document 24] at 33-34; see also SAC ¶¶ 191-234.  Plaintiff asserts the aforesaid misconduct gives rise to several violations of the RICO statute, 18 U.S.C. §§ 1961-1968:

Count Eight –  18 U.S.C. § 1962(a) – "It shall be unlawful for any person who has received any income derived . . . from a pattern of racketeering . . . in which such person has participated as a principal . . . to use or invest, directly or indirectly, any part of such income . . . in the acquisition of any interest in . . . any enterprise which is engaged in . . . interstate or foreign commerce."

Count Nine –  18 U.S.C. § 1962(c) - "It shall be

---

[22]   In light of the Court's standing determination, see supra Part II, the named Defendants are limited to Heritage and Atlantic.  Consequently, the factual allegations related to the RICO claims regarding the Other Dealer Defendants are in essence averments relating to persons that although asserted to be involved in the RICO-related conduct, are no longer parties to this lawsuit.

> unlawful for any person employed
> by or associated with any
> enterprise engaged in . . .
> interstate or foreign commerce, to
> conduct or participate . . . in
> the conduct of such enterprise's
> affairs through a pattern of
> racketeering activity or
> collection of unlawful debt."

Count Ten – 18 U.S.C. § 1962(d) – "It shall be unlawful for any person to conspire to violate any of the [aforesaid] provisions . . . ."

In assessing the plausibility of Plaintiff's RICO claims, it is important to keep in mind that RICO "'does not cover all instances of wrongdoing. Rather it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity.'" US Airline Pilots Ass'n v. Awappa, LLC, 615 F.3d 312, 317 (4th Cir. 2010) (quoting Gamboa v. Velez, 457 F.3d 703, 705 (7th Cir. 2006)). The Fourth Circuit has warned that courts:

> must also exercise caution "to ensure that
> RICO's extraordinary remedy does not
> threaten the ordinary run of commercial
> transactions; that treble damage suits are
> not brought against isolated offenders for
> their harassment and settlement value; and
> that the multiple state and federal laws
> bearing on transactions . . . are not
> eclipsed or preempted."

Id. (alteration in original) (quoting Menasco, Inc. v. Wasserman, 886 F.2d 681, 683 (4th Cir. 1989)).

### 1.   RICO Conspiracy Claim (Count Ten)

In Count Ten, Plaintiff alleges that Heritage, Atlantic, and the Other Dealer Defendants conspired to engage in a pattern of racketeering activity, such as mail and wire fraud, in violation of 18 U.S.C. § 1962(d).  The Copperweld intracorporate conspiracy doctrine is applicable to a § 1962(d) RICO conspiracy claim.  See Sadighi v. Daghighfekr, 36 F. Supp. 2d 279, 297 (D.S.C. 1999).  Consequently, the RICO conspiracy claim shall be dismissed for the reasons stated above regarding the Conspiracy Contention.  See supra Part II.C-D.

Accordingly, Count Ten shall be dismissed.


### 2.   Substantive RICO Claims (Counts Eight and Nine)

In Counts Eight and Nine, Bailey presents claims that Heritage and Atlantic are liable for violations of §§ 1962(a) and (c) of the RICO statute.

To plead a RICO claim under §§ 1962(a) and/or (c), a Plaintiff must allege adequately a pattern of racketeering activity and that she suffered injury to her property as a result of the alleged RICO violations.  See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985) (discussing § 1962(c)); Busby v. Crown Supply, Inc., 896 F.2d 833, 836-37 (4th Cir. 1990) (discussing § 1962(a)).  There is an additional element of "distinctiveness" required for a claim under § 1962(c).

The Defendants seek dismissal of Bailey's § 1962(a) and § 1962(c) claims, contending that Bailey has failed to plead adequately:

- Cognizable RICO injury – required for (a) and (c)

- Distinctiveness – required for (c)

- Pattern of racketeering activity – required for (a) and (c)

a.   Cognizable RICO "Injury"

For a private person to maintain a claim for a RICO violation, the claimant must establish that he or she was "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). That is, to have standing to bring a private RICO claim, a plaintiff plausibly must allege that she suffered injury to her property and that the injury was caused by the asserted RICO violation. See generally Walters v. McMahen, 684 F.3d 435, 444 (4th Cir. 2012) ("[T]he RICO predicate acts must not only be a 'but for' cause of a plaintiff's injury, but the proximate cause of that injury as well."), cert. denied, 133 S. Ct. 1493 (2013); Wang Labs., Inc. v. Burts, 612 F. Supp. 441, 444 (D. Md. 1984) ("[T]his Court concludes that [Plaintiff's] allegations of injury to its business reputation and customer goodwill in addition to its

loss of revenues satisfied the injury requirement of 18 U.S.C. §
1964(c)" for purposes of a Rule 129(b)(6) dismissal motion.).

The Defendants assert that Plaintiff has failed to allege
she suffered a cognizable injury to her property as a result of
the Defendants' alleged RICO violations because the SAC merely
contains bald assertions that Plaintiff lost the opportunity to
decline to purchase the Vehicle in light of the rental history
and/or to insist on a price concession from Heritage. See
Regions Bank v. J.R. Oil Co., LLC, 387 F.3d 721, 728-31 (8th
Cir. 2004) (explaining that injury to intangible property
interests cannot support standing to bring RICO claims).
However, as discussed supra in connection with the MCPA claim,
the factual allegations in the SAC present a plausible claim
that Plaintiff was overcharged for the Vehicle because the
Vehicle was sold falsely as a former consumer car. See supra
Part III.C.

Defendants take the position that the "overcharged injury"
is still insufficient because it does not amount to a concrete
financial loss to Plaintiff. While Defendants do not cite to
any Fourth Circuit case law, other circuits have held that "'a
showing of 'injury' requires proof of concrete financial loss,
and not mere 'injury to a valuable intangible property
interest.'" See, e.g., Steele v. Hosp. Corp. of Am., 36 F.3d 69,
70 (9th Cir. 1994) ("[T]he district court held that because the

patients did not show any proof of concrete financial loss, they lacked standing. The district court explained that it was the insurance companies and not the patients themselves who suffered financial loss from the allegedly fraudulent health care billings. [We agree that i]t is not enough that the patients show that their insurance company had to pay out more than it otherwise would have without the alleged RICO violation."). However, it appears that allegations that one was overcharged for a car as a result of a fraudulent scheme to conceal the car's true history, and thus its actual market value, could be found to present a claim for a concrete financial loss. Cf. Wilson v. Parisi, 549 F. Supp. 2d 637, 640, 652 (M.D. Pa. 2008) (considering plaintiffs' claim that they paid more for their property than its fair market value to be a cognizable injury in a RICO case involving "a predatory lending scheme aimed at low income . . . buyers"). The bulk of the out-of-circuit cases relied upon by the Defendants does not diminish the viability of Plaintiff's RICO injury theory. See, e.g., In re Taxable Mun. Bond Sec. Litig., 51 F.3d 518, 523 (5th Cir. 1995) ("[Plaintiff] has not alleged lost profits. Rather, he only alleges a lost opportunity to borrow at a low interest rate. . . . Such speculative damages are not compensable under RICO . . . ."); Fleischhauer v. Feltner, 879 F.2d 1290, 1299-1300 (6th Cir. 1989) ("RICO plaintiffs are entitled only to damages to business

or property proximately caused by the predicate acts.  Applying

this rule to the circumstances of this case we believe that

plaintiffs' damages should be limited to the amounts actually

invested" and cannot include compensation for physical injury or

mental suffering. (citation omitted)).

The case of In re Bridgestone/Firestone, Inc. Tires

Products Liab. Litig., 155 F. Supp. 2d 1069 (S.D. Ind. 2001),[23]

cited by the Defendants was a putative class action case.  In

Bridgestone, the plaintiffs asserted RICO claims, among others,

based on the allegation that that they had leased or owned

vehicles equipped with Firestone tires and that those tires were

unreasonably dangerous due to their propensity to suffer tread

separation and were therefore defective.  155 F. Supp. 2d at

1076-77.  As to the asserted RICO injury, the plaintiffs claimed

to have "'paid inflated prices to buy or lease products the

market has now devalued because their previously concealed

design defects render them unsafe.'"  Id. at 1090-91 (citation

omitted).  In a lengthy analysis, the Bridgestone court held

that the plaintiffs' allegations of injury resulting from "the

diminished value of their property" did not satisfy RICO's

injury requirement because plaintiffs did not sustain "an

actual, concrete monetary loss (i.e., an 'out-of-pocket' loss)."

---

[23]    Bridgestone, 155 F. Supp. 2d 1069 (S.D. Ind. 2001), on
reconsideration in part, 205 F.R.D. 503 (S.D. Ind. 2001), rev'd
in part, 288 F.3d 1012 (7th Cir. 2002).

Id. at 1090-96.  According to the court, "Plaintiff's assertion of financial loss [wa]s grounded in the possibility of future events" - the tires may, at some time in the future, suffer from tread separation, or the plaintiffs may resell vehicles equipped with the tires at a lower price than they would have received without the defect.  Id. at 1091.  Thus, because the plaintiffs had not yet "realized the diminished value or experienced product failure," the court held that there was no tangible economic harm compensable under RICO.  See id.

The instant case is not a products liability case.  Unlike the plaintiffs in Bridgestone, Bailey does not allege that the Vehicle suffers from a defect concealed by Heritage or that the Vehicle's economic value has diminished because of the possibility that a defect will manifest at some point in the future.  Further, Bailey does not base her claim on some future loss.  Rather, Bailey contends that she suffered the claimed loss at the moment of purchase in reliance upon the false representation that she was not buying a former short-term rental vehicle.

Plaintiff has alleged a plausible and cognizable RICO injury.

b.   <u>Distinctiveness</u>

    It is unlawful under 18 U.S.C. § 1962(c):

            for any <u>person</u> employed by or associated
            with any <u>enterprise</u> engaged in, or the
            activities of which affect, interstate or
            foreign commerce, to conduct or participate,
            directly or indirectly, in the conduct of
            such enterprise's affairs through a pattern
            of racketeering activity or collection of
            unlawful debt.

(emphasis added).

    "[T]o establish liability under § 1962(c) one must allege

and prove the existence of two distinct entities: (1) a

'person'; and (2) an 'enterprise' that is not simply the same

'person' referred to by a different name." <u>Cedric Kushner</u>

<u>Promotions, Ltd. v. King</u>, 533 U.S. 158, 161 (2001).  That is,

there must be a "person," alleged to have violated § 1962(c) and

to be liable to the claimant for damages, who is separate and

distinct from the "enterprise," or tool, through which the RICO

violation occurred.  <u>See</u> <u>Busby</u>, 896 F.2d at 840-41.  A "person"

can be an individual or corporate entity.  18 U.S.C. § 1961(3).

Of course, there may be multiple persons whose association with

the same RICO enterprise gives rise to multiple violations of

§ 1962(c).

    A RICO "enterprise" is defined as "any individual,

partnership, corporation, association, or other legal entity,

and any union or group of <u>individuals associated in fact</u>

                                 44

although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). The RICO enterprise must "exist[] separate and apart from the pattern of racketeering activity in which it was engaged." United States v. Tillett, 763 F.2d 628, 630-31 (4th Cir. 1985). A RICO enterprise is characterized by "'continuity, unity, shared purpose and identifiable structure.'" United States v. Fiel, 35 F.3d 997, 1003 (4th Cir. 1994) (citation omitted). An association-in-fact enterprise is not defined by a formal legal structure, but is instead characterized by the association of its members "for a common purpose of engaging in a course of conduct." Cf. United States v. Turkette, 452 U.S. 576, 583 (1981).

The parties debate whether the common entity ownership renders any claim that Heritage and Atlantic were distinct from MileOne Automotive implausible. The pertinent cases relied upon by the parties relating to common ownership between "persons" and an "enterprise" generally fall into two categories: (1) the RICO enterprise is a formal entity or (2) the RICO enterprise is an "association-in-fact" of which the alleged RICO "persons" are members.

(i)  Formal Entity Enterprise

With respect to the formal entity scenario, in Cedric Kushner Promotions, the Supreme Court addressed an alleged § 1962(c) claim in which the liable "person" was the individual

45

sole owner/employee of a corporation and the "enterprise" was
the corporation. See 533 U.S. at 160. Where the owner, or RICO
"person," allegedly was conducting the enterprise's corporate
affairs in a RICO-forbidden way, the Supreme Court held that
there was sufficient distinction. See id. at 163, 166. The
Supreme Court noted that in such a situation, "[t]he corporate
owner/employee, a natural person, is distinct from the
corporation itself, a legally different entity with different
rights and responsibilities due to its different legal status.
And we can find nothing in the statute that requires more
'separateness' than that." Id. at 163. However, the Supreme
Court explicitly distinguished the case before it from instances
in which the "corporation [i]s the 'person' and the corporation,
together with its employees and agents, [is] the 'enterprise.'"
See id. at 164.

The Fourth Circuit has held that the distinctiveness
necessary for a § 1962(c) claim is lacking "when a corporation
and its wholly owned subsidiary are involved" because then, "a
'person' is not distinct from an 'enterprise.'" NCNB Nat'l Bank
of N.C. v. Tiller,[24] 814 F.2d 931 (4th Cir. 1987); see also
United States v. Crysopt Corp., 781 F. Supp. 375, 381 (D. Md.

---

[24]    NCNB Nat'l Bank of N.C., 814 F.2d 931 (4th Cir. 1987);
overruled on other grounds by Busby v. Crown Supply, Inc., 896
F.2d 833 (4th Cir. 1990).

1991) ("Fourth Circuit precedent is clear that RICO defendants
must be legally distinct from the enterprise through which they
allegedly conduct racketeering activities.").  Although not
adopting a per se rule, other courts have held that a parent and
its wholly owned subsidiary lack the distinctiveness necessary
to be a "person" and an "enterprise," respectively, where there
is no assertion that the subsidiary took action independent of
its parent.  See, e.g., Bessette v. Avco Fin. Servs., Inc., 230
F.3d 439, 448-49 (1st Cir. 2000).


### (ii) Association-in-Fact Enterprise

With respect to the second category of an association-in-
fact, in which the alleged "persons" are also members of the
"enterprise," there is certainly judicial recognition that "a
defendant may be both a person and a member of a collective RICO
enterprise" without negating the distinctiveness requirement.
See, e.g., In re Lupron Mktg. & Sales Practices Litig., 295 F.
Supp. 2d 148, 173 (D. Mass. 2003) (citing United States v.
Goldin Indus., Inc., 219 F.3d 1271 (11th Cir. 2000); Cullen v.
Margiotta, 811 F.2d 698 (2d Cir. 1987), overruling on other
grounds recognized by Cruz v. FXDirectDealer, LLC, 720 F.3d 115
(2d Cir. 2013)).  As analogized by the Lupron court, "[t]he
basic idea is that while one basketball player does not
constitute a team, an association of five players does, without

each losing his identity as a distinct person." Id. However, a
"singular person or entity [cannot be] both the person and the
only entity comprising the [association-in-fact] enterprise."
United States v. Goldin Indus., Inc., 219 F.3d 1271, 1275 (11th
Cir. 2000).

Thus, just as adequate distinctiveness may be missing
between a parent-person and a wholly owned subsidiary-enterprise
(or vice versa), it may also be lacking where the parent and its
wholly owned subsidiaries are both the "alleged persons" and the
sole members of the association-in-fact enterprise. Cf. In re
Toyota Motor Corp. Unintended Acceleration Mktg., Sales
Practices, & Products Liab. Litig., 826 F. Supp. 2d 1180, 1202
(C.D. Cal. 2011) (holding that the plaintiffs failed to allege
sufficiently distinctiveness between "persons" and "association-
in-fact," when "four named, affiliated corporate Defendants"
were alleged to be both the RICO persons and the enterprise, on
the grounds that "Plaintiffs merely allege that the Defendants
are associated in a manner directly related to their own primary
business activities").

(iii) Resolution

Bailey's claims fall into the second category of "person"
and "enterprise" in the common ownership context – association
in fact. Plaintiff alleges that Heritage and Atlantic are the

48

"persons" liable for violating § 1962(c) and that the RICO "enterprise" – MileOne Automotive - is an association in fact comprised of the union of Heritage, Atlantic, and the Other Dealer Defendants.[25]  Thus, Plaintiff alleges that the parent (Atlantic) and its wholly owned subsidiary (Heritage) are both the "persons" and the "enterprise."  The Defendants assert that there is no plausible claim that Heritage and Atlantic are meaningfully distinct from MileOne Automotive, given the common ownership and the factual allegations that Heritage and the Other Dealer Defendants simply carry on the business of Atlantic.

In the SAC, Plaintiff seeks to label MileOne Automotive as separate and distinct from the parent corporation and wholly owned subsidiaries of which it consists.  However, "'[t]he presence [] of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint' cannot support the legal conclusion." Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321, 326 (4th Cir. 2001) (alteration in original) (citation omitted). Labeling the corporations and MileOne Automotive as "distinct"

---

[25]     Claims against the Other Dealer Defendants have been dismissed from the instant suit.  See supra Part II.D.  However, allegations of their membership in MileOne Automotive are relevant to Plaintiff's claim that Heritage and Atlantic are liable "persons" who committed RICO violations through MileOne Automotive, an association made up of themselves and others.

entities is a legal conclusion that must be supported by underlying factual allegations to avoid dismissal. With respect to the facts, the SAC contains allegations that:

- Atlantic "owns and operates car dealerships [including Heritage and the Other Dealer Defendants and] is engaged in selling vehicles through multiple dealerships that it owns and operates;"

- Atlantic, Heritage, and the Other Dealer Defendants are separately incorporated and have their own business location and employees (other than an overlap in management);

- Heritage and the Other Dealer Defendants are used car dealerships that sell used vehicles to consumers;

- Atlantic, Heritage, and the Other Dealer Defendants operate jointly through MileOne by using the MileOne logo and website to market and sell used vehicles; and

- Through the MileOne Automotive association, Atlantic, Heritage, and the Other Dealer Defendants routinely concealed the prior rental history of used vehicles sold to consumers in violation of Maryland law.

See SAC ¶¶ 3-17, 20-34.

The allegations in the SAC are inadequate to plead a plausible claim that Mileone Automotive is a distinct entity from Heritage, Atlantic, and the Other Dealer Defendants for purposes of Plaintiff's § 1962(c) claim. Heritage and the Other Dealer Defendants are wholly owned subsidiaries of Atlantic. Plaintiff alleges that Heritage and the Other Dealer Defendants

are all used car dealerships under the operation and ownership

of Atlantic and that these commonly owned entities operate

jointly and associate together as MileOne Automotive to sell

used vehicles legitimately, as well as fraudulently.  As a

result, Bailey has not presented a plausible claim that the

alleged RICO persons and the alleged association-in-fact

enterprise are distinct.

Accordingly, all claims in Count Nine shall be dismissed.

### c.    Pattern of Racketeering Activity

To plead a claim under § 1962(a), a plaintiff must allege

facts presenting a plausible basis to find (1) racketeering

activity and (2) a pattern of such activity.[26]

"Racketeering activity" is defined at § 1961(1) as any one

of several indictable offenses, including mail fraud and wire

fraud.  The Fourth Circuit has expressed concern "about basing a

RICO claim on predicate acts of mail and wire fraud because it

will be the unusual fraud that does not enlist the mails and

wires in its service at least twice." GE Inv. Private Placement

Partners II v. Parker, 247 F.3d 543, 549 (4th Cir. 2001).

A "'pattern of racketeering activity' requires at least two

acts of racketeering activity, one of which occurred after the

---

[26]    This analysis is also applicable to § 1962(c), but the
Court has already found those claims subject to dismissal on
other grounds.  See supra Part III.D.2.b.

effective date of [the RICO statute] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity.'"  US Airline Pilots Ass'n, 615 F.3d at 318 (alteration in original) (quoting 18 U.S.C. § 1961(5)).  "[W]hile two acts are necessary, they may not be sufficient."  Sedima S.P.R.L., 473 U.S. at 496 n.14.  To state a plausible claim of a pattern of racketeering activity, the plaintiff must allege facts establishing "that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity."  Cf. H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989) (reversing a 12(b)(6) dismissal of a RICO complaint and discussing what a plaintiff in a RICO case must show to prove a pattern of racketeering activity).  With respect to the requirement that the predicate acts be "related," the Fourth Circuit has explained that "[t]he relationship criterion may be satisfied by showing that the criminal acts 'have the same or similar purposes, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events.'" Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians, 155 F.3d 500, 505-06 (4th Cir. 1998) (quoting H.J. Inc., 492 U.S. at 240).

Here, the Defendants assert there is no viable claim of a pattern of racketeering activity because the Plaintiff has

alleged only one instance of specific fraudulent conduct directed at her. [Document 21-1] at 22. Plaintiff disagrees, pointing to allegations in the SAC that Heritage and others within the MileOne Automotive association routinely engaged in the same fraudulent conduct as that directed against Plaintiff, on "hundreds if not thousands of occasions," vis-à-vis other purchasers, like the members of the putative class. SAC ¶¶ 84-106. However, the conclusory general assertion that the Defendants engaged in numerous acts of mail and/or wire fraud by concealing the former short-term rental use of vehicles from purchasers other than Bailey is insufficient. A "plaintiff must plead 'circumstances of the fraudulent acts that form the alleged pattern of racketeering activity with sufficient specificity pursuant to Fed.R.Civ.P. 9(b).'" Menasco, Inc. v. Wasserman, 886 F.2d 681, 684 (4th Cir. 1989) (quoting Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1400 (9th Cir. 1986)).

In the absence of any specific allegation of fraudulent conduct beyond that directed to Plaintiff, the SAC fails to allege a plausible pattern of racketeering activity. See Grant v. Shapiro & Burson, LLP, 871 F. Supp. 2d 462, 475 (D. Md. 2012) (dismissing RICO claim because the complaint failed to allege any specific fraudulent conduct outside of that directed to the plaintiff); Davis v. Wilmington Fin., Inc., No. PJM 09-1505,

2010 WL 1375363, at *4 (D. Md. Mar. 26, 2010) (dismissing RICO claim because, _inter alia_, the allegations of racketeering in the complaint were "limited solely to Plaintiffs and their mortgage transaction").

The Court will dismiss the RICO claims in the SAC due to the failure adequately to allege a pattern of racketeering activity.  The Court will not, however, foreclose Plaintiff from engaging in discovery pertinent to the claims not dismissed[27] herein that may yield evidence adequate to support a plausible claim of a pattern of racketeering activity to justify the reinstatement of Count Eight.


IV.  CONCLUSION

For the foregoing reasons:

    1.   Defendants' Motion to Dismiss Second Amended
         Complaint [Document 21] is GRANTED IN PART AND
         DENIED IN PART.

    2.   All claims against the Other Dealer Defendants
         are dismissed.

    3.   All claims in Counts Nine and Ten are dismissed.

    4.   All claims in Count Eight are dismissed without
         prejudice to the ability of Plaintiff to seek to

---

[27]  For example, at least the deceit claim in Count Four would appear to provide a basis for discovery as to customers deceived in addition to Bailey.

reinstate the claim upon presentation of an
adequate basis to assert a pattern of
racketeering activity.


SO ORDERED, on <u>Friday, January 17, 2014.</u>

                          _____/s/_____
                          Marvin J. Garbis
                     United States District Judge